## Case No. 4,984.

### FOSTER et al. v. SWASEY.

[2 Woodb. & M. 217; 10 Law Rep. 32; 16 Hunt, Mer. Mag. 602.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1846.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq. 10 Law Rep. 32, contains only a partial report.]

T. P. Chandler, for plaintiff.
Allwyn & Paine, for defendant.

WOODBURY, Circuit Justice. The motion
is refused, because it is so late. The place
of the plaintiff's residence appears in the bill,
and was known several terms ago. 1 Dan-
iels, Eq. Prac. 36, 41; 3 Johns. Ch. 520. The
motion, therefore, should have been made
before so much cost was incurred, and the
case ready for a hearing. A motion of this
kind, too, is granted only when the party is
a resident abroad. Newl. Ch. Pr. 410. Cases
exist where being resident in Ireland or Scot-

land has been regarded as abroad for this purpose. But those countries are under distinct judicial tribunals, and in some respects under different laws; while in this case the plaintiff resides, not out of the United States, nor even out of this circuit, but in the state of Maine. I think it would, at this late day in the case, and under the circumstances of his living within this circuit, be unjustifiable to require him to furnish security as coming either within our practice or that of England. The 44th rule provides, if the plaintiff lives without the state, the defendant may require security for cost, if moving it at the first term. But the motion is not made in season to come within this rule, and being founded only on the general practice in chancery, must by that be refused.

At a subsequent day in the term, after the argument in chief on the case, the following opinion on the merits was delivered by—

WOODBURY, Circuit Justice. This case is one of some difficulty as to entertaining jurisdiction over it in equity, and as to the real merits between the parties. There is enough alleged to give jurisdiction prima facie, by averring fraud on the part of the defendant, in selling or delivering the note in part payment to the plaintiffs for this lumber, and asking for a discovery of certain material facts under oath, in order to support the charge. 1 Story, Eq. Jur. c. 6; 6 Ves. 182; 7 Johns. Ch. 201. But after having obtained all the plaintiffs could by way of discovery, it is difficult to see much in the relief requested from the supposed fraud, that could not be given at law. See cases in Pierpont v. Fowle [Case No. 11,152]. In such cases in England, a court of equity will proceed further, and complete the inquiries, or will send the parties to law, when the jurisdiction is there concurrent and the remedy ample, according as to its discretion may seem proper. See cases in Pierpont v. Fowle [supra]. Here, under the 16th section of the judiciary act [1 Stat. 82], it has sometimes been held, that a like course will be pursued. Bean v. Smith [Case No. 1,174]; [Boyce v. Grundy] 3 Pet. [28 U. S.] 215; [Herbert v. Wren] 7 Cranch [11 U. S.] 370. While at other times it has been held, that the case cannot proceed in equity at all, if the power is concurrent in the whole matter at law, and the relief is as full and as good in all respects. Russell v. Clark, 7 Cranch [11 U. S.] 89; Baker v. Biddle [Case No. 764]; 1 Story, Eq. Jur. §§ 91, 194. I have been inclined to the latter opinion; and hence would not proceed to sustain jurisdiction longer in equity than to obtain the disclosure, as has been done here already, if it was not as well settled in my judgment, that having once obtained jurisdiction of a case, in equity on proper grounds, and what remains to be done being still a proper subject for equity, it is taken out of the operation of the 16th section of the judiciary act.

The court in equity may, in such a case, proceed to finish it, if deemed expedient, and if a good ground in equity is set out, rather than send the parties to new actions and longer delays in the courts of law. Warner v. Daniels [Case No. 17,181], and cases there cited; [Hepburn v. Dunlop] 1 Wheat. [14 U. S.] 197; Gaines v. Chew, 2 How. [43 U. S.] 619; [Pratt v. Law] 9 Cranch [13 U. S.] 493. An additional reason for continuing to act in equity here is, that some of the material facts have been obtained by the disclosure, and in rescinding the contract for fraud, if void, some conditions may be imposed as to the return of the note, which could not be at law. The time of taking this objection is also excepted to; but, as remarked in the case just cited, of Pierpont v. Fowle, it need not be by demurrer, unless appearing on the face of the bill; and where a disclosure is asked as here, the court should in no case send it to law till after the answer and disclosure are completed in equity. Continuing, then, to sustain jurisdiction over this case, it once having been proper for a discovery, and still being a matter of fraud to be decided, over which the general jurisdiction of a court of equity is clear, the next inquiry is, whether the facts disclosed in connection with the other proof, show the defendant to have been guilty of fraud in disposing of this note.

What was said and done at the time of the sale is the first test. The defendant was not then present, but did the business by an agent. What that agent said and did, will not bind him, it is argued, as he was a special agent for this business alone, and acting under a written authority, which gave him no direction to make false representations, or to bind his employer by any warranties or affirmations. It is true, that such is the general rule in cases of that character. 5 Johns. Ch. 247; Raymond v. Crown & E. Mills, 2 Metc. [Mass.] 324. It is, therefore, that such an agent is himself liable to a suit in that case. Pasley v. Freeman, 3 Durn. & E. [3 Term R.] 51. But this principle relates to the power of such an agent to enter into a contract for his principal, and to bind him by express stipulation. For, at the same time that this principle thus applies, it is well settled, that if an agent, in making a sale of an article, commits a fraud or states falsehoods as to material facts, which are relied on, it exposes the sale to be avoided. The theory is not, in such case, that he binds his employer by any engagement which he is not empowered to make, but that his employer cannot take the benefit of his sales without taking the burthen of them, and that he must repudiate the whole, and not merely a part, where all was dependent and united. That if he does not choose to ratify the whole, he must ratify nothing connected and interwoven; and that the fraud or falsehood, if bad at all, is bad for the whole, and restores the parties to the condition in which they stood before it happened. Doggett v. Emerson

[Case No. 3,960]; Mason v. Crosby [Id. 9.234]. The employer of an unfaithful agent is to suffer by his misconduct generally, rather than his victim. Hence, in this case, if the agent did at the sale what he was not authorized to do, and it amounts to a falsehood or fraud, and the defendant repudiates it, he must repudiate the matter or engagement to which it related, and restore things to the position in which they would otherwise have stood. What did the agent here do? He either bought the lumber for the note and draft, or bought the lumber and agreed to pay for it in the note and draft. In either event, if the statements as to the note were deceptive, so as to avoid the sale or the payment, the amount to be refunded would be the same. It would not be the course here, if the sale was void, to rescind the sale, and restore the lumber on the one hand and the note and draft on the other. Because the lumber has, doubtless, been sold and worked up, and the draft converted into money, and the relief would rather be to give damages to the amount for which the note was received, and order the latter to be returned. So if the sale of the lumber was good, but the payment, so far as regards the draft, void, because accompanied by deception, then the relief would be, the further payment of a sum equal in amount to the note.

It is of no consequence, therefore, under which aspect it is regarded. But the difficult and doubtful question is, whether the agent was in fact guilty of deception. He denies any. The answer, also, from the information and belief of the defendant, denies any under oath. And the letter sent with the note does not expressly direct any misrepresentation to be made, and the agent swears that none was made; but that the plaintiffs were merely referred to others for information. On the other hand, the force of these matters is some weakened by the circumstance, that the respondent was not present, and hence could not know personally what took place, and that the agent is in a position impairing his credibility. Story, Ag. § 131; 1 Metc. [Mass.] 201. Beside this, there is the positive testimony of the clerk, that the agent represented the maker and indorser to be good. There is the admission of George, the agent, also, that he showed the defendant's letter to the plaintiffs at the sale, in which he states, "I think the note is good." Fraud may consist in asserting a belief as well as asserting a fact. Indeed, asserting a belief is asserting the fact of belief, and if it is done with a design to mislead, it is fraudulent. Stebbins v. Eddy [Case No. 13,342].

There are numerous circumstances, also, soon to be particularized, showing the defendant to have placed little confidence in the goodness of the note; and the distance to which it was sent for sale, and the secrecy as to the name of the owner, and the length of time the note run, with an intermediate failure of the parties to it, and the number of other like notes in the market, known to the defendant, and much discredited; lead the mind strongly to a conviction, that the defendant did not then believe the note to be good, or that it would be ever paid; and that the agent understood from the letter of the defendant that the note was to be got rid of, even at the hazard of paying more money with it; and of stating the opinion of others as of the defendant to be, that "the note was good." Allow me to repeat, as the contrary view seems to have been much relied on, that it was of no consequence whether this was flung into the form of an opinion, or assertion by Swasey or George, if it was meant to impress and did impress on the minds of the plaintiffs, convictions that the note was good, when in truth, they had sufficient reason to believe it never would be paid. [Smith v. Richards] 13 Pet. [38 U. S.] 36. Indeed, the letter of the defendant being shown to the plaintiffs by the agent, contains enough from the defendant himself to deceive and mislead, as to the goodness of the note, beside the oath of the clerk to the assertion of the agent, also, that it was good. The whole letter is tantamount to an assertion by the defendant himself, that the note was good; and all this was done when the current of circumstances is strong, that he knew and felt convinced to the contrary. Because: Firstly. Why should the defendant want to sell it for boards, if it was good? He was a grocer and a man of substance, and could well wait till it became due, rather than take lumber. Secondly. Why should he pretend in the letter, that he wished to realize the money on it earlier than the day, as a reason for selling, when he paid out on the draft $908 in money, in order to realize only $910 on the note? The gain in money to use was $2 only, till the lumber was converted into money, and out of that and other funds was to be paid freight of the lumber also from Bangor to Boston. Thirdly. How could he expect to sell for $910 what he advanced only $200 on, aided by other notes of more than $500 in amount, provided the purchasers were not in some way misled? How could he, if they were dealt fairly by, and knew as much as he did of the Rices and their condition—he who told some witnesses before in August, the note was worthless, not worth the paper it was written on? Fourthly. Why did he write, but for this wish, to be concealed in the business, when done at such a distance from his partner? and why did he not indorse the note, if he did not desire to get it off without giving his responsibility? and why not give his responsibility if the note was really believed to be good? or why did not his agent do it when asked? and why after all this, did he say, "I think the note good," if he did not mean to have it reported as the opinion of one like himself, having the best means of judgment? and why give so large commis-

sions for selling it, if not wishing to get rid of a bad note? Fifthly. How could he say likewise, that he thought the note good, when nobody at Boston would advance over $200 on it, and other notes united? when he knew several other notes of like tenor of the same parties to be in the market at a low credit, apparently "made to sell," when the same parties were otherwise indebted much to him? when they were in broker's hands? when one of them had then failed? when the other had made a conveyance of his property as early as June, 1842? and, though not known to all then, a person so much connected with them as the defendant, probably knew the fact before or as early as the sale of this note, August 5, 1842? The elder Rice testifies the business of the conveyance was done openly, and the son took possession of part of the property in June, 1842; and Swasey told Veazy he knew it in July. and Goding swears he knew it within three weeks of its taking place.

To doubt, after all this, that the Rices were both then insolvent, as they both swear, and were likely to be, when the note fell due, as both went into bankruptcy before, and their notes were pledged as early as the date of this for less than one fourth their face; and to doubt that this was the impression among money dealers like the defendant, as he knew no more than one fourth could then be raised on them, is not reasonable. There may be purchases or sales of notes without recourse, and this without fraud; and then the rule applies, caveat emptor. 1 Story, Eq. Jur. §§ 147–149, 204–212; 2 Kent, Comm. 482, 491; Salem India Rubber Co. v. Adams, 23 Pick. 256. The defendant's not having indorsed this note, is some evidence of such a sale here, and exonerates him from liability on the note himself as a party to it. Chit. Bills, 244; 6 Barn. & C. 373; 9 Dowl. & R. 391; 3 Durn. & E. [3 Term R.] 759. But it still leaves him responsible for the property or money given for the note in either of three events. One is, if the notes paid over or sold were bank notes or bankers' drafts, which pass as money, and were then worthless, the promissors having previously failed. 2 Hill, 509; Chit. Bills. 244–246: 7 Durn. & E. [7 Term R.] 65; 8 Yerg. 175; 10 Ves. 204; 8 Durn. & E. [8 Term R.] 40; 11 Wend. 9. Though once the rule was different, if they were paid over when the debt was incurred. Id.; 12 Mod. 203; 6 Barn. & C. 373. Another is, if they were promissory notes, which the seller knew to be worthless. Fenn v. Harrison, 3 Durn. & E. [3 Term R.] 759. Lord Kenyon said it was like sending out a counter, instead of current coin. Another, though more doubtful, is, that if without such knowledge, notes or drafts on individuals are not specially agreed to be taken at the risk of the purchaser, the loss will not fall on him. Ex parte Blackburne, 10 Ves. 204; Jones v. Ryde, 1 Marsh. 157–

159. But if he agrees to take the risk, he must, if nothing indicates fraud or knowledge, and it is an honest exchange. Chit. Bills, 246, and cases. When it is questionable what the agreement or knowledge was, it seems more just to require a good payment for a good consideration. There are, then, several equitable grounds made out in this case for a recovery, with considerable strength of evidence, but some of them more satisfactorily than others. One is, that the defendant has received valuable property of the plaintiff, for which he has not paid in full, except by a worthless note, which it is doubtful whether the plaintiff agreed to take at his own risk. Another is, that it was passed to the plaintiff by the defendant's agent, under circumstances rendering it probable that the defendant knew and believed the note to be worthless. And finally, the evidence is quite strong, that false representations were made by the defendant as to the note being good, which were communicated to the plaintiff by his agent, and which led to the purchase.

It is satisfactory to reflect, also, in support of the equity of this conclusion, that the defendant will lose nothing by it, as he will have the benefit of his note against the Rices if they be good, since it must be restored to him; and will be obliged merely to pay, for aught which appears, a fair market price for the lumber he got, merely making up now the part which was paid in worthless paper, like that which is counterfeit, or on a broken bank. The man who circulates such a discredited note as this, should suffer by it, rather than a credulous and innocent receiver. I have not gone into the question, as to this note being an accommodation one, and without consideration (4 Johns. Ch. 128; 7 Wend. 5677), because, in the hands of third persons without notice, like the plaintiffs, and before due, that circumstance would be no defence. Let the decree be entered, that there was fraud as to the note in controversy, when sold in part payment for the lumber, and that it be restored to the defendant on his paying the amount for which it was taken by the plaintiff with interest since. and which amount and interest he is decreed to pay.

A question as to costs was afterwards made, which is not deemed of sufficient importance to be reported.